IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |
|---|---|
| GENESCO INC.,<br><br>       Plaintiff,<br><br>   v.<br><br>VISA U.S.A. INC., VISA, INC., AND<br>VISA INTERNATIONAL SERVICE<br>ASSOCIATION,<br><br>       Defendants. | Civil Action No. 3:13-CV-0202<br>Chief Judge William J. Haynes, Jr.<br><br>JURY DEMAND |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL DISCOVERY**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................II

INTRODUCTION ................................................................................................................... 2

THE VISA DISCOVERY REQUESTS AT ISSUE ON THIS MOTION ................................... 4

ARGUMENT ........................................................................................................................... 7

I.  THE EXPANDED PCI ESI SEARCH REQUEST SEEKS IRRELEVANT,
    INADMISSIBLE INFORMATION AND WOULD UNJUSTIFIABLY BURDEN
    GENESCO. ...................................................................................................................... 7

    A.  The Expanded PCI ESI Search Request Seeks Irrelevant, Inadmissible
        Information. ........................................................................................................... 8

        1.  Visa Cannot Demonstrate a Good Faith Basis for Believing That at the Time
            of the Intrusion, Genesco Was Non-Compliant with Any of the 240 Other PCI
            DSS Requirements. ........................................................................................ 8

        2.  Evidence Sought by the Expanded PCI ESI Search Request Is Irrelevant and
            Not Within the Scope of Discovery. ................................................................ 10

        3.  Evidence Sought by the Disputed Topics Would Be Inadmissible. ............. 11

    B.  Complying with the Expanded PCI ESI Search Request Would Unjustifiably
        Burden Genesco .................................................................................................... 15

        1.  Genesco Has Already Undertaken an Enormous Effort in this Case to
            Provide Visa with Discovery, Including Documents Relating to Genesco's
            Compliance with the PCI DSS ....................................................................... 16

        2.  Complying with the Expanded PCI ESI Search Request Would Be
            Enormously Expensive and Would Be Expected to Generate a Miniscule Number
            of Responsive, Non-Privileged Documents ..................................................... 18

II. THE REMEDIAL MEASURES REQUESTS ARE OVERLY BROAD AND UNDULY
    BURDENSOME ............................................................................................................ 21

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Alhambra Building & Loan Ass'n v. DeCelle,
47 Cal.App.2d 409 (Cal. Ct. App. 1941) ....................................................14

Cognex Corp. v. Electro Scientific Indus., Inc. No. Civ.A. 01CV10287RCL, 2002 WL
32309413, at *1 (D. Mass. July 2, 2002) ................................................16

General Ins. Co. of America v. Pathfinder Petroleum Co.,
145 F.2d 368 (9th Cir. 1944) ......................................................................14

Genesco Inc. v. Visa U.S.A. Inc.,
2013 WL 3790647 (M.D. Tenn. July 18, 2013) .................................4, 12

Grant, Konvalinka & Harrison, P.C. v. U.S.,
2008 WL 4865566 (E.D. Tenn. Nov. 10, 2008) ......................... 9-10, 15

Harbor Ins. Co. v. Continental Bank Corp.,
922 F.2d 357 (7th Cir. 1990) ............................................................. 11-12

In Aircrash in Bali, Indonesia, 871 F.2d 812 (9th Cir. 1989) .....................................23

Kakule v. Progressive Cas. Ins. Co., 2008 WL 1902201 (E.D. Pa. April 30, 2008) ...................22

Laws v. Stevens Transport, Inc., No. 2:12-cv-544, 2013 U.S. Dist. LEXIS 32221 (S.D.
Ohio Mar. 8, 2013) ......................................................................................22

Martel v. California Dep't of Corrections,
2006 WL 2131306 (E.D. Cal. July 28, 2006) ..........................................15

Micro Motion, Inc. v. Kane Steel Co.,
894 F.2d 1318 (Fed. Cir. 1990)....................................................................10

Millennium Partners, L.P. v. Colmar Storage, LLC, 494 F.3d 1293 (11th Cir. 2007) ................23

Nexen Petro. U.S.A. Inc. v. Sea Mar Div. of Pool Well Servs. Co., No. 06-3043, 2007 WL
2874805 * 5 (E.D. La. Sept. 26, 2007) ......................................................23

Ohio & Mississippi R.R. Co. v. McCarthy,
96 U.S. 258 (1877)........................................................................................11

Rupracht v. Certain Underwriters at Lloyd's of London Subscribing to Policy No.
B0146LDUSA0701030, No. 3:11-cv-00654, 2012 WL 4472158 (D. Nev. Sept. 25,
2012). ..............................................................................................................14

Surles v. Greyhound Lines, Inc., 474 F.3d 288 (6th Cir. 2007) ........................... 8-9, 16

Case 3:13-cv-00202   Document 150   Filed 10/25/13   Page 3 of 30 PageID #: 3491

*Trzeciak v. Apple Computers, Inc.*, No. 94 Civ 1251, 1995 U.S. Dist. LEXIS 428
(S.D.N.Y. Jan. 19, 1995) ........................................................................................................22

*Vardon Golf Co. v. BBMG Golf Ltd.*,
156 F.R.D. 641 (N.D. Ill. 1994).................................................................................... 21-22

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26(b)(1).........................................................................................7, 10, 15

Fed .R. Civ. P. 26(b)(2)(C)(iii) ..........................................................................16, 20, 21

Fed R. Evid. 407 .................................................................................................. 21-24

Case 3:13-cv-00202   Document 150   Filed 10/25/13   Page 4 of 30 PageID #: 3492

Plaintiff Genesco Inc. ("Genesco") respectfully submits this Opposition to the Motion to Compel Discovery filed by Defendants (collectively, "Visa"). By its motion, Visa seeks to compel Genesco to do two things:

- Conduct an *expanded* ESI-based search for documents relating to Genesco's compliance with the Payment Card Industry Data Security Standards (the "PCI DSS"), under which that search would cover not just the period *before*, but also the period *after*, discovery of the criminal computer network intrusion (the "Intrusion") that is the subject of this action (the "Expanded PCI ESI Search Request").

- Respond to certain Visa interrogatories and requests for admission that are directed towards information security enhancement measures that Genesco may have taken subsequent to suffering the Intrusion (the "Remedial Measures Requests").

Visa's motion is the latest example of Visa's unfortunate strategy of defending this case by overwhelming Genesco – a company this is less than *one-thirtieth*[1] of its size – with extremely burdensome requests for wholly irrelevant discovery. Visa's motion should be denied:

- The Expanded PCI ESI Search Request should be rejected as not reasonably calculated to lead to the discovery of admissible evidence in view of:

  ° the irrelevance and inadmissibility of the documents encompassed by the Expanded PCI ESI Search Request (see Point I.A below);

  ° the enormous effort Genesco has already undertaken in this case to provide Visa with document discovery, including documents relating to Genesco's compliance with the PCI DSS (see Point I.B.1 below);

  ° the substantial expense that complying with the Expanded PCI ESI Search Request would impose on Genesco and the miniscule number of responsive, non-privileged documents that the Expanded PCI ESI Search Request would be expected to locate. (See Point I.B.2 below).

- The Remedial Measures Requests should be rejected as not reasonably calculated to lead to the discovery of admissible evidence because they all seek information that is just as irrelevant and inadmissible as that sought by the Expanded PCI ESI Search Request and that in any event would be inadmissible under Federal Rule of Evidence 407. (See Point II below.)

---

[1] Visa's reported total assets and total equity were approximately $35.3 billion and $27 billion respectively – more than *twenty-three* and *thirty-two* times greater, respectively than those reported by Genesco. Affidavit of Seth Harrington dated October 25, 2013 ("Harrington Aff") ¶¶ 84-85.

1

<u>**INTRODUCTION**</u>

The Intrusion, which took place between December 2009 and November 2010, was discovered on November 30, 2010. Harrington Aff. Exh G at 3; Affidavit of Roger Sisson ("Sisson Aff.") ¶ 7. On that day, Genesco was advised by Trustwave Inc. ("Trustwave") of the presence of malicious software on Genesco's network. Sisson Aff. ¶ 7. Visa had required that Trustwave be retained to conduct a forensic investigation of Genesco's network after Visa received reports suggesting the possibility of a compromise of that network. *Id.* ¶ 3. Trustwave is one of a handful of forensic firms approved by Visa to conduct forensic investigations of actual or suspected data security breaches involving payment card data. Harrington Aff. ¶ 9.

Subsequent to discovery of the Intrusion, Visa conducted a six-month investigation of the Intrusion, with the assistance of Trustwave, for the express purpose of determining whether Genesco was non-compliant with the PCI DSS during the Intrusion (and, if so, whether based on such non-compliance Visa could validly impose fines and issuer reimbursement assessments by reason of the Intrusion) (the "Visa Investigation"). Harrington Aff. ¶ 15. Genesco cooperated fully with the Visa Investigation. Sisson Aff. ¶ 6. On January 27, 2011, Trustwave distributed to Visa its report on the Intrusion (the "Trustwave Report"). Harrington Aff. ¶ 17. The Trustwave Report concluded that, at the time of the Intrusion, Genesco was in violation of four of the 244 PCI DSS sub-requirements -- but that Genesco was in full compliance at that time with each and every one of the PCI DSS's other 240 requirements. *Id.* At no point during the Visa Investigation did Visa question Trustwave's conclusion that Genesco was fully compliant with the other 240 PCI DSS requirements. Harrington Aff. ¶ 18. Nor did Visa ever request any additional information from Genesco regarding its information security generally. *Id.*

By letters dated May 31, 2011, Visa declared its investigation of the Intrusion "complete"; determined "[b]ased on the information in the Trustwave Report" that Genesco had not been compliant with the PCI DSS at the time of the Intrusion; and, accordingly, assessed each of the Acquiring Banks a $5,000 fine (the "Fines").[2] Harrington Aff. Exs. B & C; Visa Defendants' Memorandum of Law and Facts in Support of Its Motion to Compel Discovery ("Visa Memo") at 5.

Thereafter, by letters dated November 8, 2011, Visa advised the Acquiring Banks that, based on Genesco's alleged "PCI DSS Violations" at the time of the Intrusion, it had found the Intrusion to be eligible for both the Account Data Compromise Recovery ("ADCR") and Data Compromise Recovery Solution ("DCRS") programs,[3] and was imposing issuer reimbursement assessments under those programs in the amount of $11,996,664.71 against Wells Fargo and $1,342,409.83 against Fifth Third (jointly, the "Assessments"). Harrington Aff. Exs. D, E, & F. In its Motion, Visa admits that the alleged Genesco PCI DSS violations on which it based the Fines and Assessments were the four violations ostensibly found in the Trustwave Report: "Based on the information in the Trustwave Report, including its findings of three PCI DSS violations, Visa determined that the Intrusion qualified under the ADCR and DCRS programs. Visa Memo at 5. In other words, Visa *admits* that the 240 *other* PCI DSS requirements as to which Trustwave found no violation by Genesco were entirely *irrelevant* to its determination to impose and collect the Fines and Assessments.

---

[2] The VIOR purportedly permit Visa to impose "fines" on banks like the Acquiring Banks in the event they breach their contractual obligation under the VIOR to ensure a merchant's compliance with the PCI DSS. Harrington Aff. ¶ 5, Ex. A at 3-4.

[3] Under the ADCR and DCRS processes, the VIOR purportedly permit Visa to recover losses incurred by Visa issuers when a merchant suffers an "account compromise event" (or, in the case of DCRS, "data compromise event") and (among other requirements) the merchant in question committed a PCI DSS violation that could have allowed the compromise. Harrington Aff. ¶¶ 6-8, Ex. A at 5-14.

Visa collected the Fines and the Assessments from the Acquiring Banks in June 2011 and January 2013, respectively, which amounts were indemnified by Genesco pursuant to its separate agreements with the Banks, whether or not they were lawfully imposed. Harrington Aff. Ex. H. Genesco commenced this action on March 7, 2013, seeking to recover the amount of the Fines and Assessments from Visa on the ground that they had been unlawfully imposed and collected.

### THE VISA DISCOVERY REQUESTS AT ISSUE ON THIS MOTION

As one of its many bases for claiming that Visa acted unlawfully in imposing and collecting the Fines and Assessments, Genesco contends that Trustwave, and therefore Visa, erred in finding Genesco in violation of the four PCI DSS requirements called out in the Trustwave Report. Compl. ¶¶ 48 and 52 ("at the time Visa imposed the Non-Compliance Fines, Visa had no reasonable basis for concluding that Genesco was non-compliant with the PCI DSS requirements at the time of the Intrusion or at any other relevant time"). As this Court held, Genesco's allegations that Visa imposed and collected the Fines and Assessments without a factual basis validly state claims under the California Unfair Competition Law and for unjust enrichment and money-had-and-received. *Genesco Inc. v. Visa U.S.A. Inc.*, 2013 WL 3790647 *22-23 (M.D. Tenn. July 18, 2013). In other words, if as Genesco contends, the Trustwave Report erred in finding Genesco to have been in violation at the time of the Intrusion of the four PCI DSS requirements specified by the Trustwave Report, Genesco is *for that reason alone* entitled to recover the Fines and Assessments from Visa, and this case is over.

Visa knows full well that it cannot defend the Trustwave Report's four findings of PCI DSS non-compliance on the part of Genesco and, as a result, cannot defend its own conduct in imposing the Fines and Assessments based on those four erroneous findings.[4] Visa has,

---

[4] [REDACTED]

accordingly, come up with a "Plan B" for defending this case, hoping to prove that at the time of the Intrusion Genesco was in violation of one of the 240 *other* PCI DSS requirements that Visa admits were *not* relied upon by Visa in imposing the Fines and Assessments. Evidently, Visa thinks that establishing a violation of one of those other PCI DSS requirements will enable Visa to get around its inability to establish any of the four alleged PCI DSS violations that were the actual bases for the Fines and Assessments when Visa imposed them.

As part of this "Plan B" defense, Visa has focused much of its discovery effort in this case on finding evidence of a Genesco violation of one of those *other* PCI DSS requirements. Visa served document requests, interrogatories, and requests for admission that, rather than focusing specifically on the four PCI DSS requirements that Trustwave found to have been violated, instead inquired *generally* into Genesco's PCI DSS compliance and information security posture at the time of the Intrusion. Harrington Aff. ¶ 23 & Exhs. I, J, and K. Genesco uniformly objected to these requests, for three reasons: first on the ground that Visa had no reasonable basis for believing that, and thus had no reasonable basis for taking discovery as to whether, at the time of the Intrusion Genesco was non-compliant with one of the 240 *other* PCI DSS requirements not relied upon by Visa in imposing the Fines and Assessments; second because even if the discovery sought by Visa might reasonably be expected to yield evidence of a Genesco violation of one of these *other* PCI DSS requirements, such evidence would be irrelevant to whether Visa acted lawfully in imposing the Fines and Assessments; and third because even if such evidence were both relevant and reasonably expected to be discovered, it would be inadmissible. Harrington Aff. ¶ 29 & Ex. N, O, & P.

Visa and Genesco then engaged in several meet-and-confer conferences relative to these discovery requests. Harrington Aff. ¶ 30. Following those conferences, Genesco continued to

5

assert the validity of its objections, but did agree, notwithstanding those objections, to conduct both a non-ESI-based, targeted search for documents relating generally to Genesco's PCI DSS compliance during the period of the Intrusion and an ESI-based search for pre-Intrusion documents of this sort, using search terms approved by Visa (the "Visa-Approved Search Terms"). Harrington Aff. ¶¶ 34, 37. Genesco made this agreement not because it believed such documents to be relevant, but rather in part because it could undertake such searches without incurring undue expense, and in part because it expected any responsive documents located by means of such search to corroborate Genesco's position that there is no reason to believe that, and thus Visa has no reasonable basis for taking discovery as to whether, at the time of the Intrusion Genesco was non-compliant with one of the 240 *other* PCI DSS requirements not relied upon by Visa in imposing the Fines and Assessments. Harrington Aff. ¶ 38. In regard to this latter point, Genesco is about to complete its production of the documents it undertook to search for in regard to Genesco's PCI DSS compliance in general, and Genesco believes that, as anticipated, nothing in those documents creates any reason to believe that at the time of the Intrusion Genesco was non-compliant with one of the 240 *other* PCI DSS requirements not relied upon by Visa in imposing the Fines and Assessments. Harrington Aff. ¶ 39.

While as described above Genesco made substantial efforts during the meet-and-confer process to reach a middle ground with Visa regarding its objections, Genesco did draw the line on two pieces of that discovery. First, Genesco declined Visa's Expanded PCI ESI Search Request, under which Genesco would have been required to use the Visa-Approved Search Terms to try to find not just pre-Intrusion, but also post-Intrusion, documents relating generally to Genesco's PCI DSS compliance. Harrington Aff. ¶ 40. Second, Genesco also declined Visa's Remedial Measures Requests, which would have required Genesco to respond to interrogatories

6

and requests for admission relative to security measures Genesco may have taken subsequent to the Intrusion.  Harrington Aff. ¶ 41.  In each case, Genesco based its refusal to comply with the Visa request on the irrelevance and inadmissibility of the information being sought by the request and the substantial burden that would be imposed on Genesco were it required to comply with that request.  Harrington Aff. ¶ 42.

Visa now moves for an order compelling Genesco to comply with the Expanded PCI ESI Search Request and the Remedial Measures Requests.

## ARGUMENT

For the reasons set forth below, the Expanded PCI ESI Search Request and the Remedial Measures Requests are not reasonably calculated to lead to admissible evidence and hence Visa's motion should be denied.

## I. THE EXPANDED PCI ESI SEARCH REQUEST SEEKS IRRELEVANT, INADMISSIBLE INFORMATION AND WOULD UNJUSTIFIABLY BURDEN GENESCO.

Fed. R. Civ. P. 26(b)(1) defines the scope of discovery as "any nonprivileged matter that is relevant to any party's claim or defense."   Although "relevant" information need not be admissible to be within the scope of discovery, it must be "reasonably calculated to lead to the discovery of admissible evidence."  *Id.*  The Expanded PCI ESI Search Request is not reasonably calculated to lead to the discovery of admissible evidence because (1) Visa has no reasonable basis for believing that Genesco was non-compliant with any of the 240 *other* PCI DSS requirements not relied upon by Visa in imposing the Fines and Assessments; (2) such evidence would be irrelevant to whether Visa acted lawfully in imposing the Fines and Assessments; and, (3) even if such evidence were both relevant and reasonably expected to be discovered, it would be inadmissible.  See Point I.A below.  Moreover, complying with the Expanded PCI ESI Search

7

Request would put an unjustifiable burden on Genesco, given (1) the enormous effort Genesco has already undertaken in this case to provide Visa with document discovery, including documents relating to Genesco's compliance with the PCI DSS generally; and (2) the substantial expense that complying with the Expanded PCI Search Request would impose on Genesco and the miniscule number of responsive, non-privileged documents that the Expanded PCI ESI Search Request would be expected to locate.  See Point I.B below.

**A.    The Expanded PCI ESI Search Request Seeks Irrelevant, Inadmissible Information.**

**1.    Visa Cannot Demonstrate a Good Faith Basis for Believing That at the Time of the Intrusion, Genesco Was Non-Compliant with Any of the 240 Other PCI DSS Requirements.**

As summarized above, Visa's stated purpose in advancing the Expanded PCI ESI Search Request is to try to establish that at the time of the Intrusion Genesco was in violation of one of the PCI DSS's *other* 240 requirements that Visa never relied upon in imposing and collecting the Fines and the Assessments.  But Visa has not shown (and cannot show) that it has a good faith basis for believing that at the time of the Intrusion Genesco was not in compliance with one or more of those other requirements.  Accordingly, the Expanded PCI ESI Search Request is an impermissible "fishing expedition" by which Visa hopes to get around its inability to validate any of the four alleged PCI DSS violations that were the actual grounds for Visa's decision to impose the Fines and Assessments.  *See Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) (parties should not "be permitted 'to "go fishing" and a trial court retains discretion to determine that a discovery request is too broad and oppressive.") (citations omitted).

Indeed, not only can Visa offer no basis other than pure speculation for supposing that Genesco was non-compliant with any of the 240 *other* PCI DSS requirements at the time of the Intrusion, the evidentiary record overwhelmingly negates that speculation.  For one thing,

8

Genesco's own internal assessments of its PCI DSS compliance conducted just prior to and during the period of the Intrusion find Genesco to have been 100% compliant as of those dates with *all* the PCI DSS requirements. Harrington Aff. Exs. U & V. Even more compelling is the affirmative finding by Visa's approved investigator Trustwave – which finding was never challenged or questioned by Visa at any point prior to this litigation – that during the Intrusion Genesco was in full compliance with each of the 240 other PCI DSS requirements. *Id.* ¶¶ 17-18.

Moreover, at no point during the six-month long Visa Investigation or during the ensuing two years during which Genesco presented its challenges to Visa's conclusion that a PCI DSS violation had occurred during the Intrusion, did Visa or Trustwave raise any issue with Genesco's compliance or non-compliance with any of the other PCI DSS Requirements. *Id.* ¶ 18. Instead, Visa first pulled this issue out of thin air after Genesco commenced this lawsuit. While Visa now describes categories of internal and external communications regarding Genesco's compliance with those other requirements that it hopes to discover, *see* Visa Memo at 12, it supports the Expanded PCI ESI Search Request with nothing more than bald assertions that such documents may exist to corroborate its "Plan B" defense. Unsupported assertions that the Expanded PCI ESI Search Request might turn up something of interest do not make the request "reasonably calculated" to lead to the discovery of admissible evidence. *See Grant, Konvalinka & Harrison, P.C. v. U.S.*, 2008 WL 4865566 *4 (E.D. Tenn. Nov. 10, 2008) (denying discovery based on bald assertion that request may lead to the discovery of admissible evidence); *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1326 (Fed. Cir. 1990) ("[D]iscovery may be denied where, in the court's judgment, the inquiry lies in a speculative area.").

Visa argues that the information regarding Genesco's compliance with the 240 other PCI DSS requirements "also is relevant to whether Genesco was harmed by Visa's alleged conduct."

9

But Visa's "no harm, no foul" argument makes no sense. Visa's incorrect PCI DSS findings directly caused Visa's imposition of the Fines and Assessments, which in turn directly caused Genesco to suffer the damages it seeks to recover in this case. See Point I.A.2 below. Had Visa not made those incorrect findings, Genesco would never have suffered those damages, and this case never would have happened – whether or not Genesco was in violation of some *other* PCI DSS requirement at the time of the Intrusion. It thus is utterly illogical for Visa to argue that, even though Visa's original PCI DSS findings were unlawful, Genesco would still have suffered the damages it claims if, unbeknownst to Visa, Genesco had been in violation of some *other* PCI DSS requirement when the Intrusion occurred.

### 2. Evidence Sought by the Expanded PCI ESI Search Request Is Irrelevant and Not Within the Scope of Discovery.

Even if Visa had a reasonable basis for thinking that the Expanded PCI ESI Search Request would generate evidence of a Genesco violation of one or more of the 240 other PCI DSS requirements that Visa in no way relied upon in imposing the Fines and Assessments in the first place, which has not been shown, such evidence would be entirely irrelevant to the case and thus not within the scope of discovery under Rule 26(b)(1). Under its contracts with the Acquiring Banks and the legal obligations it independently owed directly to Genesco, Visa had a duty *not* to impose the Fines and Assessments unless it correctly found a PCI DSS violation on the part of Genesco. Visa therefore breached that duty, and thereby violated its contracts with the Acquiring Banks and the legal obligations it owed to Genesco, to the extent its PCI DSS findings were incorrect. As far as the PCI DSS is concerned, then, the sole question in this case is whether Visa *correctly* found that Genesco committed the four PCI DSS violations that were the bases for its imposition of the Fines and Assessments. If not, then Visa violated both its contracts with the Acquiring Banks and the legal obligations it owed directly to Genesco by

incorrectly finding those four violations.  Evidence that Genesco was in violation of some *other* PCI DSS requirement at the time of the Intrusion would thus be irrelevant to whether Visa committed the legal violation alleged by Genesco and therefore is not a proper subject of discovery in this case.

### 3.  Evidence Sought by the Disputed Topics Would Be Inadmissible.

Even if there were reason to believe that forcing Genesco to incur the burden and expense of complying with the Expanded PCI ESI Search Request likely would generate evidence that Genesco committed other PCI DSS violations not found by Trustwave or Visa (which has not been shown), and even if such evidence was somehow theoretically relevant to the case (which it is not), such evidence would nonetheless be inadmissible.  A corollary of the general duty of good faith and fair dealing is the longstanding common law doctrine of "mend the hold," which as articulated by the U.S. Supreme Court prohibits a party to a contract dispute, having already given a justification for its conduct, from "chang[ing] his ground, and put[ting] his conduct upon another and a different consideration."  *Ohio & Mississippi R.R. Co. v. McCarthy*, 96 U.S. 258, 267-68 (1877).  As elaborated by Judge Posner, "mend the hold" is best understood as "a doctrine that estops a contract party to change the ground on which he has refused to perform the contract, whether or not it was a ground stated in a pleading, or otherwise in the course of litigation," in order to avoid "step[ping] on the toes of judicial estoppel" and the permissive pleading rules of the Federal Rules of Civil Procedure.  *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 364 (7th Cir. 1990).  Thus, as explained by Judge Posner, under this doctrine a party who asserts a contractual position "can properly be said to be acting in bad faith" in the event the originally asserted position fails (at some expense to the other party) and the party then "tries on another [position] for size."  *Id.* at 362.  Visa proposes to "change [its] ground" for claiming that Genesco was in violation of the PCI DSS at the time of the Intrusion,

and "tr[y] on another [alleged PCI DSS violation] for size" now that litigation has commenced over the validity of Visa's originally asserted position and Genesco has been put to the burden and expense of refuting that position.

Visa's arguments against applying the mend-the-hold doctrine here are without merit. *First,* Visa contends that, because Genesco's Sixth and Seventh Causes of Action allege claims under the California Unfair Competition Law and for unjust enrichment and money-had-and-received, the mend-the-hold doctrine is inapplicable because it is limited to contract claims. Visa, however, cites no case holding that the doctrine would not apply to such claims, and the policy underlying the doctrine suggests no reason why it should be so limited in scope. In any, event, these counts in fact *are* premised on Visa's breach of its contracts with the Acquiring Banks. Compl. ¶¶ 143-57; *see also Genesco Inc.* 2013 WL 3790647 at *21-22. That these counts include additional elements thus should not change the mend-the-hold doctrine's relevance to the propriety of Visa's attempted post-litigation "do over" of its pre-litigation assertions as to the grounds for its non-performance of its contractual obligations.

*Second*, Visa takes a narrow view of when the mend-the-hold doctrine applies, asserting that it only precludes a party from changing a position it took subsequent to the filing of the complaint. In other words, Visa asserts that after having (i) engaged in the six-month Visa Investigation, (ii) improperly determined based on that investigation to impose the Fines and Assessments, (iii) unlawfully collected the Fines and Assessments from Genesco based on that improper determination, and thereby (iv) forced Genesco to undertake the burden and expense not only of complying with the Visa Investigation but also of preparing and filing in federal court a complaint demonstrating the invalidity of the only grounds Visa had to that point asserted in defense of its actions – Visa is now free to defend its conduct on entirely new grounds,

12

notwithstanding the mend-the-hold doctrine, merely because all of its misconduct occurred before, not after, Genesco was forced to go to federal court to recover the more than $13 million of its money.

The mend-the-hold doctrine would be neutered, and the policy underlying that doctrine defeated, were it to be limited by the Court in the fashion urged by Visa. Here, by means of its "Plan B" defense, Visa proposes to "change [its] ground" for claiming that Genesco was in violation of the PCI DSS at the time of the Intrusion, and "tr[y] on another [alleged PCI DSS violation] for size" now that litigation has commenced over the validity of Visa's originally asserted position and Genesco has been put to the burden and expense of refuting that position. *This is exactly what the mend-the-hold doctrine is designed to prevent.* The fact that Visa exercised self-help instead of filing a lawsuit to get its hands on Genesco's money, and that litigation accordingly did not commence until Genesco was forced to sue to get its money back, does not in any way change the unfairness of Visa's now being permitted to change the grounds for its actions and thus should not prevent the mend-the-hold doctrine's being applied to prevent Visa from making that change.

*Third*, Visa claims that the mend-the-hold doctrine requires a showing of detrimental reliance. But as summarized above, and detailed in the Harrington Affidavit (see ¶¶ 46-74), Genesco engaged in a two-and-one-half year effort, culminating with filing a lawsuit in federal court, challenging the validity of Visa's originally asserted grounds for having found Genesco to have been non-compliant with the PCI DSS at the time of the Intrusion. Genesco thus *has* incurred substantial cost and expense by reason of, and hence *has* detrimentally relied upon, Visa's having taken that invalid position.[5]

---

[5] Visa also asserts that California law determines the applicability of the doctrine. Even if the doctrine were governed by California law, and not federal law, Visa incorrectly asserts that California does not apply the doctrine.

Notably, Visa's own rules, the Visa International Operating Regulations (the "VIOR"), confirm the mend-the-hold doctrine's application here, for they themselves establish that Visa would have no right to the "do over" it evidently hopes to pursue by means of evidence that Genesco violated one of the 240 other PCI DSS requirements. Under the VIOR, Visa may look only to the facts obtained by Visa during the course of its investigation of an event in concluding whether non-compliance fines and/or issuer reimbursement assessments are imposable with respect to that event. *See* Visa Memo at 13 ("An event qualifies for ADCR based on Visa's analysis of the forensic reports, information provided by issuers, information provided by the acquirer/merchant involved in the compromise event and analysis of fraud reporting."); *id.* ("A forensic investigation determines how the data was compromised and may determine that full Magnetic-Stripe Data that was stored or any other PCI DSS violation capable of leading to Magnetic Stripe fraud exist.").[6] Accordingly, because the VIOR themselves bar Visa from altering its grounds for imposing the Fines and Assessments based on evidence that Visa did not adduce during the now completed six-month Visa Investigation, the VIOR fully support invoking the mend-the-hold doctrine as grounds for a protective order barring Visa from seeking such evidence by means of requiring Rule 30(b)(6) testimony on the Disputed Topics.

Rather, California case law is consistent with the principle. *See Alhambra Building & Loan Ass'n v. DeCelle*, 47 Cal. App. 2d 409, 411-12 (Cal. Ct. App. 1941) (doctrine prohibited debtor's change in position regarding ownership of real property) *General Ins. Co. of America v. Pathfinder Petroleum Co.,* 145 F.2d 368, 373 (9th Cir. 1944) (doctrine prohibited raising new claims not previously asserted). The only contrary case cited by Visa is from Nevada, and that case ignores the controlling California case law and simply refers to a law review article as authority. *Rupracht v. Certain Underwriters at Lloyd's of London Subscribing to Policy No. B0146LDUSA0701030*, No. 3:11-cv-00654, 2012 WL 4472158 at *3 (D. Nev. Sept. 25, 2012).

[6] Visa advances a contrary interpretation of the VIOR under which Visa would be entitled to defend previously imposed non-compliance fines and issuer reimbursement assessments based upon after-the-fact, post-investigation evidence of the sort it is trying to obtain here. Visa Memo at 13. Visa offers not a shred of evidence to support its ipse dixit interpretation of the VIOR, and the Court should not entertain that interpretation. In a letter dated September 6, 2013, Genesco requested that Visa produce any document upon which it intends to rely for the contractual authority to impose fines and assessments based upon facts that were not obtained during the course of Visa's investigation of an alleged account data compromise event and/or that were not relied upon by Visa in imposing such fines and assessments. Harrington Aff. Ex.S. As of the date of this motion, Visa has not identified any such documents. Harrington Aff. ¶ 45.

14

For all the above reasons, this is a textbook case for applying the mend-the-hold doctrine. Because the mend-the-hold doctrine will bar Visa at trial from trying to defend its imposition of the Fines and Assessments based upon evidence that Genesco committed other PCI DSS violations not found by Trustwave and not relied upon by Visa in imposing the Fines and Assessments, Visa should not be permitted to take discovery to adduce such inadmissible evidence. *Grant, Konvalinka & Harrison, P.C.*, 2008 WL 4865566 at *4 (inadmissible evidence not discoverable where plaintiff could not articulate basis for which it would be admissible); *Martel v. California Dep't of Corrections*, 2006 WL 2131306 *1 (E.D. Cal. July 28, 2006) (denying motion to compel discovery where stated purpose of information is inadmissible).

## B.  Complying with the Expanded PCI ESI Search Request Would Unjustifiably Burden Genesco

The Federal Rules of Civil Procedure were amended in 1993, and again in 2000, to reiterate that courts should more aggressively limit discovery because of the "information explosion of recent decades." Fed .R. Civ. P. 26(b) advisory committee's note (1993 Amendment) ("The revisions in Rule 26(b)(2) are intended to provide the court with broader discretion to impose additional restrictions on the scope and extent of discovery"); *see also* Fed .R. Civ. P. 26(b)(1) advisory committee's note (2000 Amendment) ("The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated.").  The Federal Rules are especially concerned about proportionality considerations, stating that "the court *must* limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that . . . (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues" Fed .R. Civ. P. 26(b)(2)(C)(iii) (emphasis

15

added); *see Surles*, 474 F.3d at 306 (compliance with discovery requests requiring review of approximately 18,000 additional files at estimated cost of $141,000 would be "unduly burdensome" in dispute involving $8 million in compensatory damages)

> **1.** **Genesco Has Already Undertaken an Enormous Effort in this Case to Provide Visa with Discovery, Including Documents Relating to Genesco's Compliance with the PCI DSS**

"At some point, the adversary system needs to say 'enough is enough' and recognize that the costs of seeking *every* relevant piece of discovery is not reasonable." *Cognex Corp. v. Electro Scientific Indus., Inc.* No. Civ.A. 01CV10287RCL, 2002 WL 32309413, at *1 (D. Mass. July 2, 2002) (denying motion to compel additional ESI search, even though such a search "would uncover documents not already produced," given extensive search already undertaken for relevant documents.) Therefore, in assessing the propriety of the Expanded PCI ESI Search Request, the Court should have in mind not just the burden complying with that request would impose on Genesco (which is discussed below in Point I.B.2), but also the enormous effort Genesco has already undertaken in this case to provide Visa with document discovery, including documents relating to Genesco's compliance with the PCI DSS.

First, in regard to document discovery generally, Genesco has already agreed to conduct both a non-ESI-based and an ESI-based search for, and to produce any non-privileged documents identified by means of such searches, the following categories of documents:

    1)    Documents constituting the Wells Fargo Agreement and communications relating to negotiations or other discussions about the terms of the Wells Fargo Agreement related to the Intrusion.

    2)    Documents constituting the Fifth Third Agreement and communications relating to negotiations or other discussions about the terms of the Fifth Third Agreement related to the Intrusion.

    3)    Documents constituting the Reserve Agreement and communications relating to negotiations or other discussions about the terms of the Reserve Agreement, assignment of claims, or subrogation of claims against Visa.

4)    Documents relating to Trustwave's investigation relating to the Intrusion and communications with Trustwave relating to the Intrusion

5)    Communications with Wells Fargo and/or Fifth Third relating to the Intrusion

6)    Communications with MasterCard or American Express relating to the Intrusion

7)    Communications involving Genesco relating to the ADCR or DCRS programs

8)    Communications with Visa relating to the Intrusion

Harrington Aff. Ex. N Request Nos. 1, 2, 3, 4, 6, 7, 8, 9, 10, 18, 19, 20, 21, 24, 25, 26, 27, 28, 29. With respect to the ESI-based component of its search for such documents, Genesco proposed, and Visa approved, of a list of search terms that Genesco would use to search for documents falling in these categories during the entire period from January 1, 2009 through March 7, 2013. Harrington Aff. ¶ 76; Exhs. R, NN. Genesco is about to complete production of the approximately *43,000* pages of responsive, non-privileged documents it located by means of that search. *Id.* ¶ 77.

Second, with regard to documents relating to Genesco's PCI DSS compliance at the time of the Intrusion, Genesco has already committed

1.    to conduct "a reasonable non-ESI search for and produc[e] [to the extent located by means of such search] (1) any documents reflecting Genesco's PCI DSS compliance policies in place during the period of the Intrusion, or any changes to such policies, including analyses, meeting minutes, or other reasonably identifiable documents discussing those policies or actual or potential changes in those policies and (2) any documents discussing Genesco's actual or potential non-compliance with the PCI DSS and any other applicable cardholder account security requirements during the period of the Intrusion," Harrington Aff. ¶ 34; Ex. S; and

2.    to conduct an ESI-based search for documents responsive to the PCI Requests (the "Targeted Search Terms"), Genesco proposed using a list of search terms that Visa has already approved (the "Visa-Approved Search Terms") covering the period January 1, 2009 through November 30, 2010, the date of discovery of the Intrusion. Harrington Aff. ¶ 37, Ex. T; Visa Memo at 9.

Genesco is about to complete production of the approximately *37,000* pages of responsive, non-privileged documents it located by means of those searches. Harrington Aff. ¶ 78.

17

Genesco put in an enormous effort in searching for the documents it located and is producing to Visa pursuant to the above-described undertakings. Thus far, those undertakings have required Genesco to review over 73,000 documents. Harrington Aff. ¶ 79. Approximately 23,000 of those documents were identified through the ESI-based search that Genesco undertook to conduct, using the Visa-Approved Search Terms, for pre-Intrusion documents relative to its PCI DSS compliance at the time of the Intrusion. *Id.* As it turned out, only 4,500 (20%) of those 23,000 documents turned out to be both responsive and non-privileged. *Id.* ¶ 78. Adding the documents located by means of that ESI-based search to the 6,500 other responsive, non-privileged documents that Genesco located by means of the above-described ESI- and non-ESI-based document searches that Genesco agreed to undertake in response to Visa's document requests, Genesco is preparing to complete production to Visa of over 80,000 pages of documents. *Id.* ¶¶ 77-78. Genesco estimates that its aggregate out-of-pocket costs in doing that document production will exceed $300,000. *Id.* ¶ 80. Those costs do not account for the cost to Genesco of the substantial internal Genesco resources that had to be devoted to that document review and production effort and, as a consequence, were diverted from other productive activities they would otherwise have engaged in on behalf of Genesco. *Id.*

> **2. Complying with the Expanded PCI ESI Search Request Would Be Enormously Expensive and Would Be Expected to Generate a Miniscule Number of Responsive, Non-Privileged Documents**

Complying with the Expanded PCI ESI Search Request would be enormously expensive, especially considering the substantial document-production effort and expenditure effort Genesco has already made in this case. Genesco calculates using the Visa-Approved Search Terms to search Genesco's post-intrusion ESI would generate approximately 38,000 additional "hit-on" documents that would then have to be reviewed for responsiveness and privilege. Harrington Aff. ¶ 82. In other words, the Expanded PCI ESI Search Request would *almost triple*

18

Genesco's ESI-based search for documents relative to its PCI DSS compliance at the time of the Intrusion, because the approximately 38,000 *post*-Intrusion documents that Genesco would have to review to comply with the Expanded PCI ESI Search Request would be on top of the approximately 23,000 documents that Genesco was required to review upon applying the Visa-Approved Search Terms to Genesco's *pre*-Intrusion ESI.  Moreover, the Expanded PCI ESI Request would increase by over 50% the *entire* 73,000-document review that Genesco has already undertaken in this case.

More importantly, complying with the Expanded PCI ESI Search Request would yield a miniscule number of responsive, non-privileged documents that have not already been located and produced by Genesco by means of one of the above-described other document search and review efforts Genesco has already undertaken in this case at enormous expense.  As noted above, when Genesco used the Visa-Approved Search terms in an effort to locate pre-Intrusion ESI relative to Genesco's PCI DSS compliance at the time of the Intrusion, those terms hit on 23,000 documents, but only 4,500 of those documents (i.e., 20%) turned out to be both responsive and non-privileged.  Harrington Aff. ¶ 78.  As dismal as the Visa-Approved Search Terms' yield was when applied to Genesco's *pre*-Intrusion ESI, however, that yield looks practically bountiful when compared to the projected yield of applying those terms to Genesco's *post*-Intrusion ESI.  Specifically, based upon Genesco's review of a sample of the documents that were hit on by applying the Visa-Approved Search Terms to Genesco's post-Intrusion ESI, only 2% of those 38,000 documents would be responsive (i.e., would relate to Genesco's PCI DSS compliance during the period of the Intrusion), and fully 70% of those responsive documents would be withheld from production because they constitute a communication with one of Genesco's attorneys for the purpose of providing legal advice and/or were generated by,

for, or at the direction of counsel in anticipation of litigation.[7] *Id.* ¶ 82.  In other words, Genesco calculates that complying with the Expanded PCI ESI Search Request would require Genesco to review 38,000 additional documents (on top of the 73,000 documents it has already reviewed in this case), and would yield a grand total of only about 250 responsive documents (a yield of less than 1%).[8]

These 250 documents would all be utterly irrelevant to the case and would in any event be inadmissible, for the reasons shown in Point I.A above.  Moreover the effort to locate these 250 documents would be on top of the enormous document production effort Genesco has already made in this case as demonstrated in Point I.B.1 above.[9]  Given these circumstances, there can be no possible justification for requiring Genesco to undertake the substantial additional document production effort that would be required to locate and produce the estimated 250 responsive and non-privileged (and irrelevant and inadmissible) documents that Genesco estimates to be located – somewhere – among the 38,000 documents Genesco would have to review to comply with the Expanded PCI ESI Search Request.  The Expanded PCI ESI Search request accordingly should be rejected by the Court in accordance with Fed. R. Civ. P. 26(b)(2)(C)(iii).

---

[7] In contrast, of the 23,000 documents that were hit on by applying the Visa-Approved Search Terms to Genesco's pre-Intrusion ESI, only 4% of the 4,500 of those documents found to be responsive are being withheld on the basis of privilege.  Harrington Aff. ¶ 83.

[8] This sampling is consistent with Genesco's analysis of over 150 search terms proposed by Visa (the "Visa Proposed Terms").  The Visa Proposed Terms hit on over 450,000 documents, and Genesco's sampling estimates that only approximately 10,000 documents would relate to Genesco's PCI DSS compliance at any time during the period January 1, 2009 through March 7, 2013.  Harrington Aff. ¶ 35.  Based on further analysis, Genesco estimates that only 400 responsive and non-privileged documents that fall within the scope of the Expanded PCI ESI Search Request would be identified by Visa's proposed search terms.  *Id.*

[9] The other factors to be considered under Fed. R. Civ. P 26(b)(2)(C)(iii) also support denying the motion, given the $13 million amount in controversy and the fact that, even were the Expanded PCI ESI Search to result in the identification of relevant, admissible evidence, it would not resolve any of Genesco's other, independently sufficient, bases for challenging the Fines and Assessments.

## II.  THE REMEDIAL MEASURES REQUESTS ARE OVERLY BROAD AND UNDULY BURDENSOME

The Remedial Measures Requests are yet another Visa discovery gambit in support of Visa's untenable "Plan B" defense and hence seek irrelevant, inadmissible information for the same reasons as outline in Point I.A above.  Visa Memo. at 21.  The Remedial Measures Requests should also be denied as they seek evidence inadmissible under Fed. R. Evid. 407.

The Remedial Measures Requests all seek information as to information security measures Genesco may have implemented subsequent to the Intrusion.  Harrington Aff. Ex. J at 10; Ex. K at 9.  Visa concedes that the sole purpose for the Remedial Measures Requests is to seek evidence that "would undercut Genesco's claim that it was PCI DSS compliant before and during the Intrusion."  Visa Memo at 21.  In other words, by means of Remedial Measures Requests Visa is seeking evidence that Genesco engaged in culpable conduct at the time of the Intrusion.  Under Fed R. Evid. 407, however, the evidence of subsequent remedial measures is not admissible to prove negligence or culpable conduct.  Moreover, while Rule 407 is a rule of evidence and not a rule of discovery, where the party seeking discovery articulates no admissible basis for seeking evidence of subsequent remedial measures, courts have denied discovery  *See Vardon Golf Co. v. BBMG Golf Ltd.*, 156 F.R.D. 641, 653 (N.D. Ill. 1994) (denying motion to compel discovery of subsequent remedial measures because the "evidence sought is not reasonably calculated to lead to the discovery of any other evidence but that relating to the culpability of Dunlop for allegedly infringing on the Raymont patent."); *see also Kakule v. Progressive Cas. Ins. Co.*, 2008 WL 1902201 *4-5 (E.D. Pa. April 30, 2008) (issuing protective order because information sought in deposition would be barred by Fed. R. Evid. 407). [10]

---

[10] On pages 19-20 of the Visa Memo, Visa cites case law in purported support of its assertion that Fed. R. Evid. 407 is "wholly inapplicable" to discovery.  The cases cited in the Visa Memo did not, as Visa suggests, allow discovery of subsequent remedial measures where the evidence obtained via the discovery would be imadmissible under Fed.

Accordingly, since Visa is not entitled to discovery as to information security enhancement measures Genesco may have taken after the Intrusion, the Remedial Measures Requests are improper.

In a vain attempt to circumvent Rule 407, Visa invokes a variety of purported exceptions to the rule in an effort to establish a basis on which evidence of "everything GENESCO did to change, modify, or alter in any way its corporate wide area network (WAN) computer system or its CARDHOLDER DATA ENVIRONMENT computer system after the INTRUSION" would be admissible. Harrington Aff. Ex. J at 10. However, none of these "exceptions" are applicable because the Remedial Measures Requests' sole purpose, as conceded by Visa, is to prove culpable conduct on the part of Genesco, i.e., that Genesco was not in compliance with the PCI DSS at the time of the Intrusion.

*First*, Visa argues that Rule 407 "does not apply where the subsequent remedial measures are involuntary" and that, because Genesco was allegedly required by the VIOR through its contracts with the Acquiring Banks to remediate its computer system to ensure PCI DSS compliance, these "involuntary" measures are admissible. Visa Memo at 21-22. However, there is no exception under Rule 407 for "involuntary" remedial measures undertaken pursuant to an alleged contractual obligation. Rather, the cases cited by Visa stand only for the common sense proposition that subsequent remedial measures undertaken *by a third party* without the involvement of the defendant are not excluded under the rule. *In Aircrash in Bali, Indonesia*, 871 F.2d 812, 816 (9th Cir. 1989) (report and investigation conducted by FAA of defendant

---

R. Evid. 407. Rather, those cases allowed the requested discovery only because the propounding party had demonstrated a *permissible* purpose for the admission into evidence of the subsequent remedial measures in question, which Visa has not done here. *See Laws v. Stevens Transport, Inc.*, No. 2:12-cv-544, 2013 U.S. Dist. LEXIS 32221*8 (S.D. Ohio Mar. 8, 2013) (discovery of subsequent remedial measures may be permitted where evidence could be offered for a permitted purpose); *Trzeciak v. Apple Computers, Inc.*, No. 94 Civ 1251, 1995 U.S. Dist. LEXIS 428 *4 n.1 (S.D.N.Y. Jan. 19, 1995) (same).

airline was not a subsequent remedial measure undertaken by a party and thus not excluded under Rule 407); *Millennium Partners, L.P. v. Colmar Storage, LLC*, 494 F.3d 1293, 1302 (11th Cir. 2007) (subsequent remedial measures undertaken by tenant who leased warehouse after defendant vacated the premises were not actions taken by a party and thus not excluded under Rule 407).[11] In short, Visa cites no case to support its position that actions taken by *Genesco*, whether pursuant to a contractual obligation or not, subsequent to the Intrusion are admissible to prove alleged PCI DSS violations by *Genesco*.[12]

*Second*, Visa claims that the information sought by the Remedial Measures Requests may be admitted to demonstrate the "feasibility" of post-Intrusion information security measures Genesco may have made. But the issue in this case is whether particular information security measures were required by the PCI DSS – not whether they were feasible. Genesco makes no argument that it was excused from implementing a PCI-DSS-required measure because doing so

---

[11] Visa cannot cite the "superior governmental authority" rule to support its contention that Genesco's post-Intrusion actions were "involuntary" and thus subject to an exception under Rule 407. *See, e.g.*, *Nexen Petro. U.S.A. Inc. v. Sea Mar Div. of Pool Well Servs. Co.*, No. 06-3043, 2007 WL 2874805 * 5 (E.D. La. Sept. 26, 2007) (actions required by federal regulatory authority do not implicate the social policy motivating Rule 407). Although Visa certainly behaves as if it were a government agency not subject to the rules of law that apply to the rest of corporate America, it is in fact a private actor engaging in contractual relationships with its participating financial institutions. There is no case holding that evidence of compliance with an alleged contractual obligation is admissible to prove breach of that contractual obligation. Indeed, the Hobson's choice that Visa would force on merchants that suffer a breach would directly implicate the concerns underlying Rule 407.

[12] As a fallback argument, Visa contends that it could have offered evidence of Genesco's post-Intrusion information security enhancements against *the Acquiring Banks* had they themselves brought their contract claims against Visa instead of subrogating and/or assigning those claims to Genesco, so that result should not change simply because Genesco has now stepped into the Acquiring Banks shoes in regard to those claims. Visa Memo at 22-23. But Visa's premise is faulty: in point of fact, Rule 407 would not have permitted Visa to offer such evidence against the Acquiring Banks had they themselves brought their contract claims against Visa. Plainly, Rule 407 must operate to preclude a person's subsequent remedial measures from being used to establish that person's culpability not only in an action directly against that person (e.g., here, Genesco), but also in an action seeking to impute that person's culpability to another person (e.g., here, the Acquiring Banks). Any other result would eviscerate Rule 407, for in any action against a corporation, Rule 407 could be avoided by the artifice of asserting that the subsequent remedial measures in question were being to establish not the *corporation's* culpability, but rather the culpability of some other person (be it an employee or a contractor) for whose conduct the corporation is derivatively liable. Such an outcome would disincentivize corporations from causing or even encouraging their contractors to institute subsequent remedial measures and hence would seriously undermine Rule 407's policy to encourage subsequent remedial measures by enabling a corporation (or others acting on its behalf) to take such measures without those measures being used in evidence against the corporation to show culpability.

would not have been "feasible."  And Visa has not argued (and in any event would have no basis for arguing) that PCI DSS can be interpreted to require a particular measure merely because its implementation was "feasible."  Since the feasibility (or lack thereof) of any particular information security measure is thus irrelevant to Genesco's compliance or non-compliance with the PCI DSS at the time of the Intrusion, Visa has no ground for seeking discovery of Genesco information security enhancements (or any other discovery for that matter) with a view towards establishing the feasibility of any particular information security measure.

*Third*, Visa also claims that the evidence of Genesco's post-Intrusion information security enhancements would be admissible to show the cause of the Intrusion.  Visa Memo at 24.  But, just as with Visa's feasibility argument, the question of causation is irrelevant.  There is not question in this case as to how the intruder obtained access to Genesco's network.  The only question is whether Genesco is *culpable* for the intruder's access by reason of having been in violation of the PCI DSS at the time of the Intrusion.  Thus, Visa wants discovery as to Genesco's post-Intrusion information security enhancements not to show *what caused* the Intrusion, but rather to show that Genesco is *legally liable* for the Intrusion.  Under Rule 407, that purpose is impermissible.

*Finally*, Visa argues that it is entitled to seek "evidence regarding Genesco's investigation or analysis of its computer system and its security deficiencies leading up to the actual remediation of eth computer system."  Visa Memo at 25.  But as demonstrated in Genesco's pending motion for a protective order with respect to the 30(b)(6) deposition noticed by Visa, any such investigation and the facts found and communicated therein are protected from

discovery by the attorney-client and work product privileges.  *See* Memorandum in Support of Plaintiff Genesco Inc.'s Motion for a Protective order, Docket No. 89 at 13-23.[13]

## <u>CONCLUSION</u>

For all of the reasons outlined above, the Court should deny Visa's Motion to Compel Discovery.

Respectfully submitted,

By:   */s/ Overton Thompson*

Dated: October 25, 2013

Overton Thompson III (BPR 011163)
(othompson@bassberry.com)
Wendee M. Hilderbrand (BPR 023688)
(whilderbrand@bassberry.com)
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
(615) 742-7730 (telephone)
(615) 742-2804 (facsimile)

Douglas H. Meal (admitted *pro hac vice*)
Seth C. Harrington (admitted *pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
(617) 951-7000

*Attorneys for Plaintiff Genesco, Inc.*

---

[13] Even were the Remedial Measures Requests not objectionable for all of the reasons outlined above, compliance would unduly burden Genesco because they would require Genesco to identify "*everything* [Genesco] did to change, modify, or alter *in any way*" any portion of its computer network in the two-and-one-half years following the Intrusion. The substantial effort that would be required to respond to this obviously overbroad request would be enormously burdensome.  For this reason as well, then, the Remedial Measures Requests are improper, particularly in light of the irrelevance and inadmissibility of such information sought by these requests.

25

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served, via the Court's electronic filing system, on the following:

Gayle I. Malone, Jr.
John M. Tipps
Emily B. Warth
Walker, Tipps & Malone PLC
2300 One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219

Randall W. Edwards
Aaron M. Rofkahr
O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111

Robert L. Stolebarger
Andres L. Carrillo
Bryan Cave LLP
560 Mission Street, 25th Floor
San Francisco, CA 94105

This 25th day of October, 2013.

_____ /s/ Overton Thompson_____